UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LAWRENCE BRAVERMAN, | : | Case No.: 22-cv-07927 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | **COMPLAINT FOR MONEY** |
| KONINKLIJKE PHILIPS N.V., PHILIPS | : | **DAMAGES AND** |
| NORTH AMERICA LLC, PHILIPS | : | **DEMAND FOR JURY TRIAL** |
| HOLDING USA, INC., PHILIPS RS NORTH | : | |
| AMERICA LLC, and PHILIPS RS NORTH | : | |
| AMERICA HOLDING CORPORATION, | : | |
| | : | |
| Defendants. | : | |

Plaintiff Lawrence Braverman ("Braverman" or the "Plaintiff"), by his undersigned

attorneys, as and for his complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"),

Philips North America LLC ("Philips NA"), Philips Holding USA, Inc. ("Philips USA Holding"),

Philips RS North America LLC ("Philips RS"), and Philips RS North America Holding

Corporation ("Philips RS Holding") (collectively, "Philips" or the "Defendants"), alleges the

following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information

and belief:

## INTRODUCTION

1.  Plaintiff Lawrence Braverman brings this action for injuries caused from the use of

Continuous Positive Airway Pressure ("CPAP") devices designed, manufactured, distributed,

sold and injected into the stream of commerce by Defendants, which contain hazardous

polyester-based polyurethane sound abatement foam ("PE-PUR Foam") and failed to function as

designed, intended, represented and warranted by Defendants.

1

2.   Braverman seeks compensation for his economic, physical, mental, and emotional damages from suffering multiple severe diagnoses and treatments over the years, including radiation and chemotherapy for oral cancer.

3.   In addition, as a result of the injuries Braverman has sustained, his wife has suffered the loss of care, comfort, society, and affection from Braverman, for which Braverman seeks compensation.

## THE PARTIES

4.   Braverman is an individual and resident of the State of New York, Nassau County.

5.   Upon information and belief, Defendant Royal Philips is a public, foreign corporation headquartered in Amsterdam, The Netherlands.

6.   Upon information and belief, Defendant Philips NA is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. Philips NA is a wholly owned subsidiary of Royal Philips.

7.   Upon information and belief, Defendant Philips USA Holding is a Delaware corporation with its principal place of business located in Cambridge, Massachusetts.  Philips USA Holding is a holding company that is the sole member/manager of Philips NA.  Philips USA Holding is 100% owned, directly or indirectly, by Royal Philips.

8.   Upon information and belief, Defendant Philips RS is a Delaware corporation with its principal place of business located in Pittsburgh, Pennsylvania. Philips RS is a wholly owned subsidiary of Royal Philips.   Philips RS was formerly operated under the business name Respironics, Inc (hereinafter "Respironics"), which Royal Philips acquired in 2008.  Philips RS is 100% owned by Philips RS Holding, which in turn, is 100% owned by Philips USA Holding.

9.   Upon information and belief, Defendant Philips RS Holding is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.  Philips RS Holding is wholly owned by Philips USA Holding.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332(a) because there is a complete diversity in citizenship between Plaintiff and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00).

11. Specifically, as alleged herein, Plaintiff is a citizen of New York and Defendants are citizens of the Netherlands, and the States of Massachusetts and Pennsylvania.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## FACTUAL ALLEGATIONS

**I.     Defendants Knowingly Sold Defective CPAP Devices That Injured Plaintiff**

13. Philips designs, manufactures, and sells certain lines of products that are intended to help people breathe. These include CPAP and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. The primary function of these devices is to blow air into patients' airways. CPAP and BiPAP machines are intended for use during sleep, and ventilators are used continuously when needed.

14.  On June 14, 2021, Philips announced a recall of millions of its CPAP and BiPAP machines and ventilators (the "Recall") in the United States. Each of these recalled products (referred to herein as a "Recalled Device" or collectively as the "Recalled Devices") contain PE-PUR foam for sound abatement.

3

15. The list of Recalled Devices includes the Philips REMStar SE Auto CPAP and the Philips DreamStation CPAP.

16. Despite knowing for many years that PE-PUR foam would degrade and that this foam should not be used in the Recalled Devices, Philips waited until June 2021 to issue the Recall and notify the public.

17. In its Recall, Philips announced that the PE-PUR foam may break down into particles and be inhaled or ingested, and may emit volatile organic compounds ("VOCs") as gases that may be inhaled, resulting in "serious injury, which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment" (referred to herein as the "Defect"). Philips stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea, vomiting, toxic and carcinogenic effects." Philips' announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."

18. Coincidentally, Philips had just announced in April 2021 that it was launching the DreamStation 2, which does not contain PE-PUR foam.

19. Further, Philips sold humidifiers to accompany its CPAP devices ("Humidifier Accessory"), especially the DreamStation, stating in the humidifier's User Manual under the heading "Intended Use": "DreamStation Heated Humidifier is an accessory for the Philips Respironics DreamStation therapy devices to provide moisture to the patient circuit."

20. The humidifier manual quoted above had, under the heading "DreamStation Heated Humidifier Specifications" environmental specifications that included an "Operating

Temperature: 5° to 35° C (41° to 95° F")" as well as "Storage Temperature: -20° to 60° C (-4° to 140° F)" and "Relative Humidity (operating & storage): 15 to 95% (non-condensing)."

21. Philips provided the humidifier option explaining in the DreamStation User Manual that "[y]ou can use the heated humidifier and the heated tube with your device. They are available from your home care provider. A humidifier may reduce nasal dryness and irritation by adding moisture to the airflow."

22. Philips not only knew but recommended the use of the humidifier, and also advised that the device could be stored in a room as warm as 140° F despite their knowledge that warm, hot and humid conditions contributed to rapid degradation of its sound insulating foam.

II.   **Plaintiff's Use and Purchase of Recalled Devices and the Humidifier Accessory**

23. Prior to 2011, Plaintiff was diagnosed with obstructive sleep apnea.

24. In or around June 2011, Plaintiff was prescribed the use of and purchased and/or rented Philips' Respironics REMStar SE Auto CPAP device bearing Serial Number P0364600398CC, Model 550P ("First Subject Device"). The First Subject Device prescribed for and purchased and/or rented by Plaintiff was one of the Recalled Devices.

25. In or around early 2018, Plaintiff was prescribed the use of and purchased and/or rented Philips' Respironics Dream Station Auto CPAP device bearing Serial Number J20917377C347, Model Number DSX500H11 ("Second Subject Device," and collectively with the First Subject Device, the "Subject Devices"). The Second Subject Device prescribed for and purchased and/or rented by Plaintiff was one of the Recalled Devices.

26. Starting in 2018, Plaintiff was also prescribed and used the Humidifier Accessory with the Second Subject Device.

27. Starting in 2018, Plaintiff purchased and used the SoClean ozone CPAP machine cleaner each day.  Philips never informed Plaintiff that the use of SoClean with the Second Subject Device was potentially dangerous.

28. The Second Subject Device was serviced and recorded to be in good working condition several times after purchase.  In addition, over the years, Plaintiff had various supplies updated and replaced to ensure its proper functioning.

29. Notably, Plaintiff maintained longstanding daily usage compliance of the Subject Devices from 2011 through 2021, per his pulmonary doctor's recommendations for the treatment of severe obstructive sleep apnea.

30. At all times Plaintiff used the Subject Devices, including full face masks allowing toxins to enter into the mouth, in accordance with the guidelines, manual, and instructions for use set forth by the Defendants.

31. Any guidelines, manuals, and/or instructions accompanying the Subject Devices did not contain any language or warnings of the health risks of PE-PUR foam, including failing to warn of toxic carcinogenic effects.

32. At all times Plaintiff used the Subject Devices, he used the Subject Devices for a purpose for which the Subject Devices were marketed, designed, and intended.

33. At all times Plaintiff used the Subject Devices, he used the Subject Devices in accordance with the directions and instructions issued by his pulmonary doctor who prescribed the use of the Subject Device.  Plaintiff has a documented history of compliance with CPAP directives from his doctor.

III.     **Plaintiff Suffered Severe Injuries Because of the Subject Devices**

34. Throughout his life, Plaintiff was generally in good health and maintained a normal weight. Notably, Plaintiff has never smoked or chewed tobacco, and never had a prior cancer diagnosis.

35. But starting in 2015, Plaintiff's life was permanently altered by continuous bouts of mouth cancer.

36. It started when Braverman's dentist noticed potential oral cancer during a 2015 appointment, prompting Braverman to visit to his doctor.

37. Then in or around May 2015, Plaintiff had a portion of his tongue tissue biopsied and received a diagnosis of carcinoma in situ of mouth, specifically, tongue cancer.

38. As a result of the cancer diagnosis, in or around June 2015, Plaintiff received a partial left glossectomy (surgical removal of the tongue), conducted by a head and neck surgeon.

39. After the June 2015 surgery, Plaintiff suffered from pain and discomfort for at least two months, including painful swallowing, pain in his mouth, and a restricted diet with only liquids and then soft foods.

40. From then on, Plaintiff endured constant follow-up doctor appointments and numerous additional surgeries and treatments, severely and permanently harming his life and well-being. These injuries would not have occurred but for the defective nature of the Subject Devices and/or Defendants' wrongful conduct.

41. In or around August 2016, Plaintiff had another biopsy of his tongue, resulting in a carcinoma in situ diagnosis and noted as potentially a recurrence of the 2015 tongue cancer.

42. In or around October 2016, the doctor excised Plaintiff's left floor of mouth soft tissue and diagnosed verrucous carcinoma.

43. In or around March 2017, another soft tissue specimen from Plaintiff's left floor of mouth was submitted and diagnosed as carcinoma in situ, again.

44. In or around May 2017, Plaintiff suffered an excision of a tumor of the left floor mouth. The final diagnosis was squamous mucosa with severe dysplasia.

45. In or around October 2018, Plaintiff had another left floor of mouth tumor excised. The final diagnosis was squamous mucosa with moderate to high grade dysplasia.

46. Before each of these procedures and doctor appointments, Braverman experienced extreme fear and anxiety. After each procedure, Braverman had severe pain and discomfort, a restricted diet, and trouble eating while the excised sites healed.

47. However, the worst of Plaintiff's suffering was yet to come. In or around June 2021, Plaintiff had surgery to have a gastric tube ("G-tube") inserted through the abdominal wall for feedings while he underwent radiation treatments for right anterior floor of mouth squamous cell carcinoma.

48. After the G-tube insertion, Braverman had abdominal pain for approximately two weeks, to the point that he was unable to get in and out of bed without extreme pain. In addition, Braverman suffered from irritation and discomfort at the tube location.

49. Braverman's wife and daughter had to give him up to three supplemental feedings per day via the G-tube.

50. After enduring approximately three months with the G-tube while undergoing radiation, it was finally surgically removed in or around September 2021.

51. In or around June 2022, Braverman received yet another devastating diagnosis: the recurrence of papillary squamous cell carcinoma in left floor of mouth.

52. As a result, during summer 2022, Plaintiff underwent radiation, plus chemotherapy.

8

53. The rounds of radiation treatment in 2021 and 2022 caused, among other things, total loss of taste, extreme fatigue, difficulty swallowing, severe weight loss, loss of balance, weakness, inability to sleep, reduced use of tongue, slurred speech (requiring speech therapy), loss of appetite, nosebleeds, and severe pain on the tongue.

54. Further, the chemotherapy in 2022 caused extreme weight loss, rash on nose, face forehead, scalp and torso, severe pain, embarrassing crustiness on the nose, months of prescription antibiotic cream and prescription shampoo, difficulty sleeping from pain and discomfort, can no longer use CPAP due to pain from the rash, and essentially homebound due to diarrhea issues.

55. Moreover, Braverman's wife also had medical needs and Braverman is unable to care for his wife like he used to.

56. Plaintiff's various cancers since 2015, as well as all ensuing treatment and procedures undergone by Plaintiff, would not have occurred but for the defective nature of the Subject Devices and Defendants wrongful conduct.

57. Due to the defective nature of the Subject Devices and Defendants' wrongful conduct, Plaintiff has suffered severe injuries and permanent limitations and has undergone significant treatments, including surgery, radiation, and chemotherapy, that will require treatment and monitoring in the future.

58. Braverman has been suffering for over seven years because of Defendants' conduct. Besides the immediate physical and mental anguish, Braverman now suffers from a continuing state of depression and fear of recurrence.

**IV.**     **Philips Incompetently Handled the Recall and Delivery of New Devices**

59. To add even further frustration to Plaintiff's suffering, Philips incompetently handled the recall return procedure.

60. On or about June 14, 2021 (the day of the Recall), Plaintiff's pulmonary doctor urgently requested new CPAP equipment because Plaintiff's device was a Recalled Device.

61. In or around August 2021, Plaintiff's pulmonary doctor sent another equipment request due to Plaintiff's medical necessity for a CPAP machine due to his severe obstructive sleep apnea. The doctor requested either expeditious repair (noting there was presently no mechanism to do so) or replacement with a new device.

62. In or around August 2021, Plaintiff proactively called Philips and spoke with a customer service associate to register to receive a new machine but was told that he may not receive the new machine for some time.

63. In addition, the Philips associate informally mentioned during the conversation that the SoClean ozone cleaner that Plaintiff used was problematic due to insufficient cleaning.  Notably though, Philips neither informed Plaintiff that SoClean caused rapid deterioration of the CPAP machine, nor that Plaintiff should stop using SoClean.

64. Eight months after the recall, in or around February 2022, Plaintiff finally received new equipment, the Philips Respironics Dream Station 2.  Up to that time, Plaintiff used the recalled Second Subject Device every day because there was no other option available.

65. In or around February 2022, Plaintiff received a telephone call from Philips stating that a return label would be emailed to Plaintiff to return the Second Subject Device to Philips.  Plaintiff received the return label from Philips, printed it exactly as received for Fed Ex mailing, packaged the Second Subject Device, and then trekked to Fed Ex to complete the return.

66. However, after waiting nearly an hour, Fed Ex informed Plaintiff that the label was unreadable and he had to take the package back home.  Then, when Plaintiff's wife was finally able to contact a Philips associate to request a new label, they said it would take a few days to

email the new label.  Plaintiff did not receive the new label, even after attempting to contact Philips again and waiting on the phone for over thirty minutes.

67. Over six months later, in September 2022, after undergoing radiation and chemotherapy caused by the Defendants, Plaintiff finally received the return label.

<u>**TOLLING OF STATUTE OF LIMITATIONS**</u>

68. The running of any statute of limitations has been equitably tolled by Philips' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff and his physicians the true risks associated with the Recalled Devices.

69. As a result of Philips' actions, Plaintiff was unaware, and could not have reasonably known or learned through reasonable diligence, that he had been exposed to the risks and harms set forth herein and that those risks and harms were the direct and proximate result of Philips' acts and omissions.

70. Plaintiff did not have the technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury prior to learning of the recall and the basis for the recall.

<u>**CAUSES OF ACTION**</u>

**FIRST CAUSE OF ACTION**<br>**STRICT LIABLITY -- DESIGN DEFECT**

71. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

72. At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were defective, unreasonably dangerous, and posed a substantial likelihood of harm as designed.

73. The Recalled Devices, including Plaintiff's Subject Devices, are defective in design because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Subject Devices released particles and off-gas chemicals. These chemicals and particles were then inhaled and ingested by Plaintiff and caused, among other problems, cancer and toxic and carcinogenic effects.

74. It was feasible for the Defendants to design the Recalled Devices, including Plaintiff's Subject Devices, in a safer manner.  For example, devices that included non-PE-PUR foam and designs that included other types of sound abatement technologies.

75. Defendants introduced the Recalled Devices, including Plaintiff's Subject Devices, into the stream of commerce.

76. The Recalled Devices', including Plaintiff's Subject Devices', utility does not outweigh the danger inherent in their introduction into the stream of commerce.

77. At the time the Subject Devices left Defendants' possession, they were in a condition dangerous to an extent beyond what would be contemplated by an ordinary user of the Subject Devices.

78. The Subject Devices reached Plaintiff without substantial change to the condition in which they were manufactured, sold, distributed and marketed by Defendants.

79. Plaintiff used the Subject Devices for their intended or reasonably foreseeable purpose, without knowledge of their dangerous characteristics. At all times herein mentioned, and at the time of the design, manufacture, distribution, sale and/or use of the Subject Devices, the Subject Devices were not reasonably safe and fit for the purposes intended nor for reasonably foreseeable purposes and uses.

80. The defective design of the Subject Devices was a substantial factor in causing Plaintiff's injuries alleged herein.

81. Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the Subject Devices.  Further, in no way could Plaintiff have known that Philips had designed, developed, and manufactured the Subject Devices in a way as to make the risk of harm or injury outweigh the benefits.

82. As a direct and proximate cause of Defendants' placement of the Subject Devices into the stream of commerce and Plaintiff's use of the products as designed, manufactured, sold, and distributed by Defendants, Plaintiff suffered serious physical, mental and emotional injury, damages, and economic loss and will continue to suffer such harm, damages and economic loss in the future.

83. Accordingly, Defendants are strictly liable for Plaintiff's injuries and Plaintiff demands judgment against Defendants and requests compensatory damages, punitive damages, medical monitoring, together with costs, attorneys' fees, interest, and any further relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## NEGLIGENCE — DESIGN DEFECT

84. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

85. At all times mentioned herein, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices.

86. At all times relevant to this action, Defendants had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise,

promote, distribute, and sell the Recalled Devices with reasonable and due care for the safety and well-being of users, including Plaintiff who used the Subject Devices.

87. Plaintiff was a foreseeable user of the Subject Devices, and Defendants knew that Plaintiff would use the Subject Devices.

88. It was foreseeable that the Second Subject Device would be used with the Accessory Humidifier contributing to humidity; and that it could be used in many climates, and stored in very warm settings, as noted by their own environmental specifications, with said condition contributing to rapid foam degradation.

89. The Recalled Devices, including Plaintiff's Subject Devices, are defective in design because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles. These chemicals and particles were then inhaled and ingested by Plaintiff when using the Subject Devices and cause, among other problems, cancer, and toxic and carcinogenic effects.

90. The foreseeable risks of using the Recalled Devices, particularly respiratory illnesses up to and including death, significantly outweigh the benefits conferred upon patients using the devices.

91. Defendants knew or should have known that the defects of the Recalled Devices, including Plaintiff's Subject Devices, made the Recalled Devices unreasonably dangerous.

92. Defendants continued to manufacture and distribute the Recalled Devices after Defendants knew or should have known of the Recalled Devices' adverse effects or the availability of safer designs.

93. The Subject Devices were unreasonably dangerous when used by Plaintiff, who followed the instructions provided by Philips and used the Subject Devices with common knowledge of their characteristics and according to their common usage.

94. At the time the Subject Devices left Defendants' possession and continuing through when they were used by Plaintiff, the Subject Devices were in a condition that made them unreasonably dangerous to Plaintiff.

95. The Subject Devices used by Plaintiff were expected to and did reach Plaintiffs without substantial change in the condition in which the Subject Devices were manufactured, sold, distributed, and marketed by Defendants.

96. At all relevant times, Plaintiff used the Subject Devices in the manner in which the Subject Devices were intended to be used.

97. Defendants had superior knowledge of the Recalled Devices, including Plaintiff's Subject Devices, and owed a duty of care to Plaintiff.

98. Reasonable alternative designs existed for the Recalled Devices, including the Subject Devices, which would have eliminated or reduced the risk of inhalation of carcinogenic materials and VOCs including, but not limited to the use of non-PE-PUR foam or other sound abatement technologies such as those used by other manufacturers.

99. Defendants failed to exercise reasonable and due care under the circumstances and breached their duty of care.

100.     As a direct and proximate cause of Defendants' negligence, Plaintiff has suffered serious and debilitating injuries.

101.     In addition, as a direct and proximate cause of Defendants' negligence, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the foam toxins.

102.     Accordingly, Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY — FAILURE TO WARN

103.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

104.     At all times mentioned herein, Defendants designed, manufactured, and sold the Recalled Devices, including Plaintiff's Subject Devices.

105.     Plaintiff was a foreseeable user of the Subject Devices.

106.     The Recalled Devices, including Plaintiff's Subject Devices, were defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles that were then inhaled and ingested by Plaintiff causing, among other problems, cancer, and toxic and carcinogenic effects.

107.     Defendants knew that the defective condition of the Subject Devices made the devices unreasonably dangerous to users such as Plaintiff.

108.     The Subject Devices were dangerous when used by ordinary users, such as Plaintiff, who used the devices as they were intended to be used.

109.     The Recalled Devices, including the Subject Devices, are dangerous to an extent beyond what would be contemplated by the ordinary user of the devices.

110.     Defendants knew or should have known of the defects in the Recalled Devices at the time Defendants sold or provided the Subject Devices that were used by Plaintiff.

111.     At the time the Subject Devices left Defendants' possession, the Subject Devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

112.     At the time Plaintiff used the Subject Devices, the devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

113.     The Subject Devices used by Plaintiff were expected to, and did, reach Plaintiff without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Defendants.

114.     At all relevant times, Plaintiff used the Subject Devices in the manner in which the devices were intended to be used.

115.     The Subject Devices are defective because Defendants failed to warn or instruct that the PE-PUR foam in the Recalled Devices can degrade and off-gas dangerous and carcinogenic chemicals and particles, posing a serious risk to users.

116.     Defendants further failed to warn or instruct that the Recalled Devices had been adequately or properly tested.

117.     The warning and instructions that accompanied the Subject Devices failed to provide the level of information that ordinary consumers, including Plaintiff, would expect when using the product in a manner reasonably foreseeable to Defendants.

118.     Defendants further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Humidifier Accessory, would hasten the degradation of the foam and make the Second Subject Device especially dangerous.

119.     Defendants further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions, and that warm temperatures and humidity would hasten the degradation of the foam, and make the Subject Devices especially dangerous.

120.     Defendants further failed to warn or instruct that the Recalled Devices should not be used in conjunction with the SoClean ozone cleaning system which Philips now claims can hasten or cause the degradation of the foam and make the Recalled Devices especially dangerous.

121.     Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Subject Devices, Plaintiff would not have used the Subject Devices.

122.     Had Plaintiff received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocols, he would have heeded such warnings to mitigate the risk of premature foam degradation.  Notably, Plaintiff has a documented history of compliance with all of his doctor's recommendations regarding use of the Subject Devices.

123.     Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

124.     As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered serious and debilitating injuries.

125.     In addition, as a direct and proximate cause of Defendants' conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the foam toxins.

126.     Accordingly, Plaintiff demands judgment against Defendants and requests compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE — FAILURE TO WARN**

127.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

128.     At all times mentioned herein, Defendants designed, manufactured, and sold the Recalled Devices, including Plaintiff's Subject Devices.

129.     At all times relevant to this action, Defendants had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Recalled Devices with reasonable and due care for the safety and well-being of consumers such as Plaintiff, who were subject to and used the devices.

130.     In addition, Defendants owed a duty of care to Plaintiff because, among other things, they had superior knowledge with respect to the Recalled Devices including, but not limited to critical safety issues associated with foam degradation, off-gassing, and related health risks.

131.     Plaintiff was a foreseeable user of the Subject Devices.

132.     The Recalled Devices, including Plaintiff's Subject Devices, were defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles that were then inhaled and ingested by Plaintiff's use of the Subject Devices causing, among other problems, cancer, and toxic and carcinogenic effects.

133.     The foreseeable risks of using the Recalled Devices significantly outweigh the benefits conferred upon patients using the Recalled Devices.

134.     Defendants knew that the defective condition of the Recalled Devices made the devices unreasonably dangerous to users such as Plaintiff.

135.     The Recalled Devices were unreasonably dangerous when used by ordinary users, such as Plaintiff, who used the Subject Devices as they were intended to be used.

136.     The Recalled Devices, including the Subject Devices, are dangerous to an extent beyond what would be contemplated by the ordinary user of the device.

137.     Defendants knew or should have known of the defects in the Recalled Devices at the time Philips sold or provided the Subject Devices that were used by Plaintiff.

138.     At the time Plaintiff used the Subject Devices, the devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

139.     The Subject Devices used by Plaintiff were expected to, and did, reach Plaintiff without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Defendants.

140.     At all relevant times, Plaintiff used the Subject Devices in the manner in which the devices were intended to be used.

141.     Defendants breached their duty to Plaintiff by failing to warn of the risks and dangers of using the Subject Devices as they are intended to be used. The Subject Devices did not contain warnings of the risks of the PE-PUR foam and the risks of degradation, off-gassing, and related health risks.

142.     Defendants further breached their duty to Plaintiff because they failed to warn or instruct that the Subject Devices had not been adequately or properly tested.

143.     Defendants further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Humidifier Accessory would hasten the degradation of the foam and make the Second Subject Device especially dangerous.

144.     Defendants further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions; and that warm temperatures and humidity would hasten the degradation of the foam, and make the Subject Devices especially dangerous.

145.     Defendants further failed to warn or instruct that the Subject Devices should not be used in conjunction with the SoClean ozone cleaning system which Philips now claims can hasten or cause the degradation of the foam and make the Recalled Devices especially dangerous. Defendants never formally warned Plaintiff of a possible problem.

146.     The warnings and instructions of the Subject Devices did not provide the amount of information that ordinary consumers, including Plaintiff, would expect when using the devices in a reasonably foreseeable manner.

147.      Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Subject Devices, Plaintiff would not have used the Subject Devices.

148.     Had Plaintiff received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocol, he would have heeded such warnings to mitigate the risk of premature foam degradation.  Notably, Plaintiff has a documented history of compliance with all of his doctor's recommendations regarding use of the Subject Devices.

149.     As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered serious and debilitating injuries.

150.     In addition, as a direct and proximate cause of Defendant's conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the foam toxins.

151.     Accordingly, Plaintiff demands judgment against Defendants and requests compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

152.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

153.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE – RECALL

154.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

155.     In issuing a voluntary recall, Defendants assumed duties to exercise reasonable care in issuing and implementing the Recall.

156.     Defendants breached their duties by failing to adequately warn, notify, and promptly replace the Recalled Devices, including Plaintiff's Second Subject Device.

157.     Defendants further incompetently handled the routine task of sending Plaintiff a return label so that he could return the recalled Second Subject Device to Philips.  After first requesting the label in February 2022, Philips was unable to provide a usable label until September 2022.

158.     As a direct result of Philips' breach of duty, Plaintiff has suffered harm in an amount to be determined at trial.

159.     In addition, as a direct and proximate cause of Defendants' breach of duty, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of continued exposure to the PE-PUR VOCs.

160.     Plaintiff demands judgment against Philips and requests compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

161.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

162.     Philips warranted that all of the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

163.     Philips breached this express warranty in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth herein, rendering them unsuitable and unsafe for personal use.

164.     Further, through Philips' public statements, descriptions, and promises relating to the Recalled Devices, Philips expressly warranted that the products were safe and effective for their intended use.

165.     Had Plaintiff known the Subject Devices were unsafe for use, he would not have purchased or leased the Subject Devices nor would he have used them.

166.     Philips has breached its warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff reasonably expected, at the time of use, that the Subject Devices were safe for their ordinary and intended use.

167.     To the extent privity may be required, Plaintiff can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity requirement. Plaintiff relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

168.     Alternatively, Plaintiff was a foreseeable third-party beneficiary of Philips' sale of the Recalled Devices.

169.     Plaintiff is not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

170.     As a direct and proximate result of Philips' breach of its express warranties, Plaintiff has suffered serious and debilitating injuries.

171.     In addition, as a direct and proximate cause of Philips' breach of its express warranties, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the foam toxins.

172.     Plaintiff demands judgment against Philips and requests compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

### SEVENTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

173.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

174.     By operation of law, Philips, as the manufacturer of the Recalled Devices and as the provider of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiff that the Subject Devices were of merchantable quality and safe for their ordinary and intended use.

175.     Such implied warranty of merchantability is contained in N.Y. U.C.C. Law §§ 2-314, *et seq.*

176.     Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth herein rendering them unsuitable and unsafe for personal use.

177.     Had Plaintiff known the Subject Devices were unsafe for use, he would not have purchased or leased the Subject Devices nor would he have used them.

178.     To the extent privity may be required, Plaintiff can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity requirement. Plaintiff relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

179.     Alternatively, Plaintiff was a foreseeable third-party beneficiary of Philips' sale of the Recalled Devices.

180.     Plaintiff is not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

181.     As a direct and proximate result of Philips' conduct, Plaintiff has suffered serious and debilitating injuries.

182.     In addition, as a direct and proximate cause of Philips' conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the foam toxins.

183.     Plaintiff demands judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

### EIGHTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF USABILITY

184.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

185.     By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiff that the Subject Devices were usable for their ordinary and intended use.

186.     Such implied warranty of usability is codified at N.Y. U.C.C. Law §§ 2-314, *et seq*.

187.     Through usage of trade, manufacturers of prescription drugs and medical devices impliedly warrant that their products are usable for the end consumer.

188.     Philips breached the implied warranty of usability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Subject Devices while appearing normal—contained defects as set forth herein rendering them unusable.

189.     Philips, its agents and employees knew or should have known that the Recalled Devices suffer from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

190.     Philips' Recall announcement instructed Plaintiff to not use Recalled Devices, including the Subject Devices, because of the health risks.  This confirmed the true nature of the products, which at all times were adulterated and worthless.

191.     To the extent privity may be required, Plaintiff can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity requirement. Plaintiff

relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

192.     Alternatively, Plaintiff was a foreseeable third-party beneficiary of Philips' sale of the Recalled Devices.

193.     Had Plaintiff known that Philips had breached the implied warranty of usability for his Recalled Devices, he would not have purchased or leased the Subject Devices nor would he have used the Subject Devices.

194.     As a direct and proximate result of Philips' conduct, Plaintiff has suffered serious and debilitating injuries.

195.     In addition, as a direct and proximate cause of Philips' conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the foam toxins.

196.     Plaintiff demands judgment against Philips and requests compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## NINTH CAUSE OF ACTION
## VIOLATION OF N.Y. GEN. BUS. LAW § 349, ET SEQ., § 350-E, ET SEQ.

197.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

198.     Philips' deceptive acts and practices in the conduct of its business, trade and commerce are in violation of New York's consumer protection statute.

199.     Philips has engaged in consumer-oriented conduct by advertising and distributing its Recalled Devices to the general public.

200.     Philips' conduct regarding the Recalled Devices was materially misleading to the Plaintiff and a reasonable consumer in the public.

201.     As a result, Plaintiff has suffered serious and debilitating illnesses or injuries, including various bouts of cancer, chemotherapy and radiation.

202.     But for Philips' misleading conduct, Plaintiff would not have purchased and/or leased and used the Subject Devices.

203.     Philips willfully or knowingly violated N.Y. Gen. Bus. Law § 349.

204.     Plaintiff demands judgment against Philips and requests compensatory damages, punitive damages, treble damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## TENTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

205.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

206.     At all relevant times, Plaintiff was married to his wife.

207.     As a result of the injuries and damages sustained by Plaintiff, his spouse has suffered the loss of care, comfort, society, and affection from Plaintiff.

208.     Accordingly, Plaintiff demands judgment against Defendants and requests compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## ELEVENTH CAUSE OF ACTION
## PUNITIVE DAMAGES

209.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in this Complaint, with the same force and effect as if hereinafter set forth at length.

210.     Defendants' conduct as set forth herein constitutes intentional, fraudulent, malicious and/or reckless conduct; and complete disregard of the rights, safety and health of the Plaintiff.

211.     Plaintiff is thus entitled to punitive damages.

212.     Plaintiff demands judgment against Defendants and requests punitive damages, and such other relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a final judgment against Defendants as follows:

A.     Ordering compensation for all general, special, incidental and consequential damages suffered by Plaintiff as a result of the acts and omissions of Defendants as set forth above, including but not limited to past and future physical, mental, and emotional pain and suffering, medical expenses, and other costs or related out-of-pocket expenses; and

B.     Medical monitoring monetary relief, including compensatory damages for, and the creation of a fund to adequately finance the costs of: (1) providing necessary testing, evaluations, examinations, screenings, and other necessary medical consultations; and (2) providing all necessary medical and surgical procedures including consultation, diagnosis, and treatment; and

C.     Providing for all necessary attorneys' fees, costs, interest, and such further relief as the Court deems equitable and just.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: Bronxville, New York
December 28, 2022

                          **BAUMAN LAW GROUP P.C.**

                          */s/ Timothy C. Bauman*

                          Timothy C. Bauman
                          141 Parkway Road, Suite 9
                          Bronxville, New York 10708
                          Tel: (914)337-1715
                          Fax: (914) 361-4008
                          tbauman@baumanlawgroup.com

                          *Attorneys for Plaintiff Lawrence Braverman*